## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Carol Bunker, as Trustee for the
next-of-kin of Stephanie Rose Bunker,

       Plaintiff,

v.

Barb Fitzgerald, acting in her individual capacity
as a Beltrami County correctional officer; Jared
Davis, acting in his individual capacity as a Beltrami
County correctional officer; Katherine Dreher,
acting in her individual capacity as a Beltrami
County correctional officer; Crystal Pedersen,
acting in her individual capacity as medical staff in
the Beltrami County Jail; Geoffrey Keilwitz, acting
in his individual capacity as medical staff in the
Beltrami County Jail; Todd Leonard, MD, acting in
his individual and official capacity as the Medical
Director and Jail Physician at the Beltrami County
Jail and sole owner of MEnD Correctional Care,
PLLC; MEnD Correctional Care, PLLC; Phil
Hodapp, in his official capacity as Beltrami County
Sheriff; and Beltrami County,

       Defendants.

Case No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

      For her Complaint, Plaintiff Carol Bunker ("Plaintiff"), as Trustee for the next-of-kin of Stephanie Rose Bunker, hereby states and alleges as follows:

      1.    This is an action for money damages for the wrongful death of Stephanie Rose Bunker ("Stephanie") on July 11, 2017, resulting from the deliberate indifference of the Defendants from June 26, 2017 to July 1, 2017, while Stephanie was incarcerated at the Beltrami County Jail (the "Jail"). The money damages sought are those attributable to the

deprivation of Stephanie's civil rights under federal common law and not the state wrongful-death measure of damages.

2.    The deliberate indifference of Beltrami County, its contracted medical provider (MEnD Correctional Care, PLLC), and the individual Defendants proximately caused Stephanie's death, thereby violating her well-settled federal civil rights while acting under the color of state law.

3.    This action arises purely out of 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the Constitution.  State-law claims and, by consequence, the limitations and defenses under state law are not applicable to this civil-rights lawsuit.

4.    Plaintiff was appointed Trustee for Stephanie's Next-of-Kin on May 8, 2020, by Beltrami County District Judge Paul Benshoof.  Plaintiff is Stephanie's mother.  A copy of Judge Benshoof's Order is attached hereto as Exhibit A.

5.    Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Eighth and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3).  The aforementioned statutory and constitutional provisions confer original jurisdiction of this Court over this action.

6.    Stephanie, a Native American, was at all times material herein a citizen of the United States and a resident of Mahnomen, Minnesota.  She was born on April 24, 1978, making her 39 years old at the time of her death.

7.    Stephanie suffered from mental illness, including anxiety and depression, as well as substance abuse.

8.      Defendant Barb Fitzgerald was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a correctional officer at the Jail.  Fitzgerald is sued in her individual capacity.

9.      Defendant Jared Davis was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a correctional officer at the Jail.  Davis is sued in his individual capacity.

10.      Defendant Katherine Dreher was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a correctional officer at the Jail.  Dreher is sued in her individual capacity.

11.      Defendant Crystal Pedersen was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a Jail medical staff employee.  Pedersen is sued in her individual capacity as a registered nurse ("RN") employed by MEnD and Beltrami County to provide constitutionally required medical services at the Jail.

12.      Pederson was employed by MEnD as the nursing director in 2017.

13.      In 2017, Pedersen was not a Qualified Mental Health Professional according to Minnesota law.

14.      Defendant Geoffrey Keilwitz was at all times material herein a citizen of the United States, a resident of the State of Minnesota, and acting under color of state law as a Jail medical staff employee.  Keilwitz is sued in his individual capacity as a RN employed by MEnD and Beltrami County to provide constitutionally required medical services at the Jail.

90763143.1

15.     In 2017, Keilwitz was not a Qualified Mental Health Professional according to Minnesota law.

16.     Just four months prior to Stephanie's time at the Jail, the Minnesota Board of Nursing re-conferred upon Keilwitz an "unconditional license to practice registered and practical nursing" – meaning he had completed conditions placed on his license by the Board as disciplinary measures.

17.     Keilwitz had been disciplined by the Minnesota Board of Nursing for various issues relating to his conduct as a RN, including attendance, behavior and interpersonal communications in the work setting, drug and alcohol abuse and mental health issues hindering "his ability to handle stress and maintain personal and professional boundaries."

18.     In 2015, by Stipulation and Consent Order, the Minnesota Board of Nursing placed conditions on Keilwitz's license, including, but not limited to, participation in the Health Professionals Services Program and abstention from mood-altering substances.

19.     Defendant MEnD Correctional Care, PLLC ("MEnD") is a limited liability company organized under the laws of Minnesota with its principal place of business in Sartell, Minnesota.  MEnD was at all times material herein acting under color of state law as a company that contracted to provide constitutionally required medical care to inmates at the Jail.

20.     Defendant Beltrami County contracted with MEnD to provide the Jail's health-care services at all times material herein.  Defendants Pedersen and Keilwitz were selected by MEnD and its sole owner, Defendant Todd Leonard, to provide the

constitutionally required medical and mental-health care at the Jail under the County's

contractual relationship with MEnD.

21.    Defendant Todd Leonard, MD was at all times material herein a citizen of the

United States, a resident of the State of Minnesota, and acting under color of state law as the

sole owner of MEnD and the supervising medical provider at the Jail.  Additionally, Leonard

was a policy maker and was specifically involved in creating and implementing the Jail's

suicide prevention plan.  Leonard is sued in his individual, supervisory and official capacity.

Leonard never saw, evaluated or treated Stephanie during her incarceration in the Beltrami

County Jail or elsewhere in 2017.

22.    Defendant Phil Hodapp was at all times material herein a citizen of the United

States, a resident of the State of Minnesota, and acting under color of state law as the

Beltrami County Sheriff.  In that position, Hodapp was responsible for ensuring that

constitutionally appropriate medical care was provided to all inmates at the Jail.  Hodapp is

sued in his official capacity.

23.    Defendant Beltrami County is a "public corporation," suable under Minn.

Stat. § 373.01, subd. 1(a)(1).  Beltrami County is, and at all times material herein was, a

political entity charged with ensuring that constitutionally appropriate medical care was

provided to all inmates at the Jail, a 140-inmate capacity correctional facility located in

Bemidji, Minnesota.

## MEnD, THE FOR-PROFIT CORPORATION, AND ITS PERSONNEL, PROCEDURES AND PROCESSES

24.    Defendant Leonard is, and at all times material herein was, President and

Chief Medical Officer of MEnD, a for-profit company.

5

25.    Defendant Leonard is MEnD's sole member.

26.    Defendant Leonard is responsible for supervising MEnD's employees and independent contractors.

27.    At the time of Stephanie's death, MEnD contracted with at least 31 counties to provide jail medical care throughout Minnesota and Wisconsin.

28.    In June 2017, in addition to his other duties as President such as handling finances, human resources and other business duties, Defendant Leonard was the only full-time Medical Doctor for these (and perhaps other) county jails.

29.    These county jails house thousands of prisoners during any particular day and many more throughout the calendar year.

30.    These counties pay MEnD millions of dollars annually, but MEnD boasts that it has saved the counties "millions of dollars."

31.    MEnD employed only between 6 and 10 Qualified Mental Health Professionals during the relevant time to serve all of these county-jail inmates, with their substantially higher rates of mental-health problems than the general population.

32.    MEnD also has developed forms, procedures and protocols for the RNs that it employs to give the illusory appearance of care, evaluation and monitoring of the inmates/detainees.

33.    The MEnD RNs are not Qualified Mental Health Professionals according to Minnesota law.

34.    The MEnD RNs are not properly educated, properly trained or capable of performing a valid assessment of an individual's risk of suicide.

6

35.     MEnD's forms, procedures and processes are designed to provide the illusion of care, when in fact many inmates are not seen, evaluated, treated or monitored by a doctor or Qualified Mental Health Professional.  This is intentional and part of MEnD's business plan.

36.     For example, certain MEnD forms, such as its Suicide Risk Screening Form and its Chemical Withdrawal Flow Sheet, if scored high enough, would require the involvement of a higher-credentialed (and higher-cost) healthcare provider, such as a doctor or Qualified Mental Health Professional.  But, scores are typically kept artificially low on these forms in order to avoid the need for actual contact, evaluation, assessment, treatment or involvement of higher-paid medical doctors and Qualified Mental Health Professionals.

37.     Moreover, the thresholds set on MEnD's Forms before requiring further intervention (such as 36 points on the Suicide Risk Screening Form) bear no relationship to the actual risks the Forms purportedly assess.  The Forms were created by Leonard without any validation or assessment whether they accurately or adequately screen for inmate health risks.

38.     MEnD's forms, procedures and processes, therefore, provide cover for MEnD's willful blindness and conscious indifference to the serious medical needs of inmates/detainees.

39.     The MEnD RNs' form-filling activities do not constitute the actual provision of constitutionally required medical or mental-health care or treatment to inmates/detainees with obvious and serious medical needs, because MEnD's unvalidated forms – administered

7

90763143.1

by untrained and unqualified individuals – do not and cannot validly screen inmates/detainees for mental-health problems or suicide risk.

40.     These problems were particularly evident with respect to Stephanie's incarceration at the Jail from June 26, to July 1, 2017.

41.     No Qualified Mental Health Professional is mentioned in any record in relation to Stephanie's incarceration.

42.     Furthermore, only one Suicide Risk Screening Form was filled out for Stephanie *during* her incarceration, despite the serious mental-health crisis she depicted in her answers to the jail medical questions and her abnormal health assessment screen.

43.     Nevertheless, as discussed more below, Stephanie scored 36 points, requiring further involvement from a medical professional.  Yet Defendant Keilwitz highlighted the importance of providing artificially low scores on this Form, as he lowered Stephanie's suicide risk score below the 36-point threshold for further intervention *after* she committed suicide and died.

## STEPHANIE'S INCARCERATION AT THE BELTRAMI COUNTY JAIL

### A.     Severe Mental Health Issues Lead to a 15-minute Watch with Full Suicide Precautions

44.      At 11:56 p.m. on June 25, 2017, Stephanie was arrested in Beltrami County for driving under the influence, driving after revocation and shoplifting.

45.     Stephanie was taken to the Jail, where she was booked at 1:37 a.m. on June 26, 2017.

8

46.    Stephanie was charged with felony Theft and gross misdemeanor Driving While Impaired.  Beltrami County was also made aware that she had an active felony Theft warrant in Hennepin County.

47.    Stephanie was booked at the Jail at approximately 1:30 a.m. on June 26, 2017. Her first court date was scheduled for July 3, 2017 by Beltrami County Court Order dated June 27, 2017.  The same order had an obvious implication for Stephanie as it imposed $40,000 unconditional bail/$30,000 conditional bail—she would not be released from Jail custody anytime soon.

48.    Correctional Officer (CO) Katherine O'Bryan performed Stephanie's property intake on June 26, 2017, and provided her with standard Jail issued property.

49.    O'Bryan noted in the commendations section of the Jail's electronic Law Enforcement Management System – "LETG" – that Stephanie was "tanked/ntfb" and was "extremely high at intake (heroin per arresting officer.)"

50.    At 1:45 a.m. on June 26, 2017, O'Bryan initially assigned Stephanie to holding cell 221 on the second floor.

51.    It was not until June 27 that any Jail staff went through the booking medical questions with Stephanie.

52.    Stephanie's answers to The Booking Wizard Medical Questions were saved by Defendant CO Jared Davis on the LETG system at 2:55:29 p.m. on June 27, 2017.

53.    The LETG system offers space to provide explanations from the inmate, which Davis utilized for 21 questions.

54.    Of particular importance are the following answers to the booking medical

questions:

| Question | Answer (Options: Refused, No, Yes) | Explanation |
|---|---|---|
| Do you need urgent medical attention? (Right now) | Yes | Kidney stones |
| Have you recently seen a doctor or been in the hospital? | Yes | Phycological (sic) |
| Do you have any known medical problems? | Yes | Seizures |
| Do you know whether you have any hearing loss in either or both of your ears? | Yes | both |
| Do you find it difficult to understand speech in certain situations, such as in noisy environments? | Yes | |
| Do you drink alcohol or use a controlled substance on a daily basis? | Yes | Meth heroin alcohol. Prescription pills |
| Substance Abuse – when was the last consumption of alcohol? | No[1] | A few days ago |
| Substance Abuse – when was the last time you consumed any drugs? | Yes | 2 days ago |
| Mental Health – Do you feel suicidal? | Yes | Yes |
| Have you ever tried to harm or kill yourself?  If yes, when was the last time? | Yes | A couple months ago |
| Have you ever been treated for a nervous or mental disorder? (List, Date, & Doctor) depression, anxiety, etc? | Yes | Depression, anxiety disorder. Says she has been treated for everything |
| BEHAVIOR ABNORMALITIES: Belligerent, Anxious, Laughing, | Yes | Twichy (sic), fidgeting depressed |

[1] This recorded answer does not comport with the remaining answers on the booking medical questions.

10

90763143.1

| | | |
|---|---|---|
| Talkative, Crying, Incoherent, Fidgets/Rocking, Depressed? | | |
| ***********BRIEF MENTAL HEALTH SCREEN******************** | No | |
| Do you currently believe that someone can control your mind by putting thoughts into your head or taking thoughts out of your head? | Yes | |
| Do you currently feel that other people know your thoughts and can read your mind? | Yes | Once in a while |
| Have you or your family or friends noticed that you are currently much more active than you usually are? | Yes | When she does meth |
| Have there currently been a few weeks when you felt like you were useless or sinful? | Yes | Everyday |
| Are you currently taking any medication prescribed for you by a physician for any emotional or mental health problems? | Yes | Supposed to be |
| Have you EVER been in a hospital for emotional or mental health problems? | Yes | Many times |
| ***************OFFICER'S COMMENTS/IMPRESSOINS (SHOW ALL THAT APPLY)************** | No | |
| Under the influence of drugs/alcohol? | Yes | |

55.    These answers revealed that Stephanie was suffering from depression.

56.    These answers revealed that Stephanie was suffering from behavioral

abnormalities.

57.     These answers revealed that Stephanie was suffering from addiction issues and withdrawal.

58.     These answers revealed that Stephanie was suffering from psychosis.

59.     Only approximately 1-2% of persons with depression also suffer from psychosis.

60.     These answers revealed that Stephanie was suicidal.

61.     Anyone suffering from the constellation of problems evident in Stephanie's answers to the Booking Wizard Medical Questions, including depression, withdrawal, behavioral abnormalities, and psychosis, is unpredictable and a danger to herself.

62.     From these answers alone, it would have been obvious to **anyone** that Stephanie was a high suicide risk.

63.     From these answers alone, **anyone** would know that Stephanie required: a) protection from herself or b) hospitalization, or both.

64.     Due to her answers, Davis told Defendant CO Katherine Dreher that "inmate Stephanie Bunker was **suicidal**."

65.     Yet, Davis did not place Stephanie in a suicide smock after obtaining the information illustrating that she was a suicide risk.

66.     Davis did not provide Stephanie with tear-resistant sheets after obtaining the information that she was a suicide risk.

67.     Likewise, Dreher did not place Stephanie in a suicide smock after being alerted that Stephanie was suicidal.

90763143.1

68.     Nor did Dreher provide Stephanie with tear-resistant sheets after being alerted that Stephanie was suicidal.

69.     According to the LETG system, Dreher determined Stephanie's first housing assignment at the Jail.

70.     Dreher reportedly communicated the information that Stephanie was suicidal to Sergeant Todd Deshane, who instructed Dreher to call medical and inform them.

71.     Dreher reportedly called and informed MEnD medical staff that Stephanie was suicidal and, as a result, Stephanie was placed on a 15-minute watch.

72.     The Jail Inmate Event History for Stephanie shows her "Special Watch" – the 15-minute watch – was initiated at approximately 3:38 p.m. on June 27, 2017.

73.     Under Jail policy 510.1 – Special Management Inmates, "[i]nmates who pose a heightened risk to themselves…require special management, including frequent interaction and increased supervision by staff."

74.     Under Jail policy 510.9, observation *above* the normal, 30-minute well-being checks are "required for those inmates of a special need classification who may be harmful to themselves," including inmates who are potentially suicidal, mentally ill, exhibiting bizarre behavior or those experiencing withdrawal.

75.     Further, under Jail Policy 510.9, "[i]nmates who are at risk of suicide shall be seen by a qualified health care professional."

76.     Stephanie's 15-minute, heightened watch status for suicide risk from June 27 was also noted on the Jail Housing Log and the Jail Briefing Sheet/Pass On.

77.    Further, Stephanie's 15-minute, heightened watch with full suicide precautions was included on the June 27 MEnD Pass On – Medical Staff form:



78.    Additionally, a note from the day shift officers informed the following shifts that Stephanie "needed to be changed out of her blues into a tear resistant smock and given a tear resistant blanket."

79.    Despite it being widely known that Stephanie was suicidal and that she had been placed on full suicide precautions due to her answers to the Booking Wizard Medical Questions, Stephanie was **never** forced to put on a suicide smock *or* to switch out her regular jail bedding for tear resistant bedding during her incarceration at the Jail.

80.    Reportedly, Stephanie had not been placed in a suicide smock and given tear resistant bedding during the day shift of June 27 because none were clean.

81.    Then, according to a later-conducted review by the Minnesota Department of Corrections, **three** attempts were made between June 27 and June 28 to change Stephanie into a suicide smock and to switch out her bedding.

82.    Stephanie was allowed to refuse the suicide smock and protective bedding each time.

14

83.    CO Nicholas Jauch reported on his Special Watch Postlog Note from June 27, 2017 at 11:37 p.m. that Stephanie was "laying on mattress under blanket [and] refused to change into smock."

84.    CO Sabrina Strutz claimed that she went to Stephanie's cell around 12:08 a.m. on June 28 and told her that she had to change into different clothing, but Stephanie refused.

85.    Strutz reportedly asked CO Sergeant Anthony Derby how to proceed.

86.    In response, Sergeant Derby accompanied Strutz and Jauch to cell 221 to explain to Stephanie "that we needed to change her and there were certain procedures we needed to follow when someone is felling (sic) **suicidal**." (emphasis added).

87.    Stephanie again refused.

88.    Despite her known suicide risk and known, severe mental-health issues, Derby, Strutz and Jauch decided to leave Stephanie in the holding cell with regular jail clothing and bedding.

89.    Stephanie's watch status was not changed.

90.    As stated above, special watches for inmates are very different from the general welfare checks on inmates – they are heightened checks that must occur every 15 minutes, but at random intervals (not exactly on the 15-minute mark). *See also* Minnesota Rules, Part 2911.5000, subp. 5.

91.    Despite Stephanie being on special watch for suicide risk, there were numerous reported checks that occurred over the 15-minute mark between 3:38 p.m. on

June 27 and 9:42 a.m. on June 28, 2017, according to the Jail's own Inmate Event History for Stephanie.

92.    Further, according to the Inmate Event History for Stephanie, there were additional reported checks between 3:38 p.m. on June 27 and 9:42 a.m. on June 28, 2017 that occurred on regular (not random) 15-minute intervals.

93.    Furthermore, the Jail's Special Watch Postlog notes continued to reference blankets – which were *not* the tear resistant bedding required for someone on suicide watch.

**B.    The Deliberate Indifference by MEnD**

94.    According to the Special Watch log, at approximately 9:42 a.m. on June 28, Stephanie went to medical, where she was seen by Defendant Keilwitz.

95.    Prior to meeting with Stephanie, Keilwitz reportedly reviewed the answers to Stephanie's booking medical questions, including those listed in ¶55 above.

96.    A print out of the answers to Stephanie's booking Medical Questions were included in Stephanie's Jail medical file.

97.    As shown below, the following handwritten notes appear on the medical file version: "Rev 6/28/17 0800 GK" and "Seen 6/28/17 GK."



98.     A number of the answers and explanations from the booking medical questions were circled on the version included in Stephanie's Jail medical file.

99.     Upon information and belief, the circles were made by Keilwitz – the MEnD reviewer of the document.

100.    However, *not* circled by Keilwitz were the following regarding Stephanie's mental-health crisis, psychosis, suicide risk and complicating recent drug use:

- Her recent hospitalization for psychological issues;

- Her last use and recent reported use of alcohol and drugs;

- Her suicidal feelings noted two days prior;

- Her recent attempt to harm or kill herself (a couple of months earlier);

- Her belief that someone could control her mind;

- Her belief that people could read her thoughts and mind;

- Her daily feelings that she was useless or sinful;

- Her being off her medication for emotional or mental-health problems; and

- Her "many" hospitalizations for emotional or mental-health problems.

101.    During Keilwitz's June 28 meeting with Stephanie, he completed her Initial Health Assessment.

102.    During this meeting, Stephanie disclosed a prior traumatic brain injury.

103.    The following were noted in the "Orientation/Mental Health Review" section of the MEnD Initial Health Assessment form:

- Anxious, restless affect/behavior, but cooperative

17

- Mental health diagnoses of anxiety, depression and ADHD

- Suicidal ideation denied

- Positive for past suicide attempts – "2 yrs, OD, Hospitalized"

- Positive for chemical dependency – "everything under the sun"

104.    The "Nursing Assessment" portion of the MEnD Initial Health Assessment form included handwritten notes from Keilwitz and included that Stephanie now reportedly denied suicidal thoughts.

105.    The next sentence noted that "pt filled out Suicide Risk Screen Form."

106.    A "late entry" from 11:00 a.m. stated Stephanie "claim[ed] to be withdrawaling (sic)." She was given a cup for a urine drug screen with a plan to obtain the results and contact the MD.

107.    Another "late entry" noted Stephanie's urine screen was positive for "Mamph" and that Keilwitz would continue to monitor.

108.    The last entry on June 28 failed to include a time, but noted: "Spoke with Dr Todd. Will cont. Gabapentin 800 mg 1 tab PO Qid, Will also start Hydroxyzine 50 mg 1 PO TID PRN x 3 days." "Dr. Todd" meant Defendant Leonard.

109.    The MEnD Initial Health Assessment form was signed by Keilwitz at 10:01 a.m. on June 28, 2017.

110.    Stephanie's Initial Health Assessment was not reviewed by Leonard until 11:15 a.m. on July 7, 2017 – nearly a week after she hanged herself.

111.    Despite the note on the Initial Health Assessment stating that Stephanie had "filled out" the Suicide Risk Screening Form, the Form actually appears to have been filled

18

out by Keilwitz, which would comport with how MEnD utilized these Forms at other jails during this same time.

112.     The indication for screening on the MEnD Suicide Risk Screening Form was an "Abnormal Health Assessment Screen."

113.     Keilwitz checked that that Stephanie appeared to engage sufficiently to consider this a valid assessment.

114.     Keilwitz scored Stephanie at a Total Risk Assessment Score of 36 with the breakdown included below:

90763143.1

## MEND
CORRECTIONAL CARE

## Suicide Risk Screening Form

Inmate Name: Bunker, Stephanie    DOB: 4-24-78    ID: N/A

Indication for Screening:

☑ Abnormal Health Assessment Screen    ☐ BDI Score >40    ☐ Altered Mental Status

☐ Current Suicidal Remarks/Actions    ☐ Currently on Suicide Watch/Observation    ☐ MHW

☐ Other _____

Inmate appears to engage sufficiently to consider this a valid assessment? ☑ Yes ☐ No

| | Low Risk 0 | 2 | 4 | 6 | 8 | High Risk 10 |
|---|---|---|---|---|---|---|
| Plan | Denies/None | Vague, uncertain plan | Clear thoughts, reflective | Some specific | Written note and/or well thought out plan | Note written, time, place, and method chosen |
| Method | Denies/None | Undecided | Pills, cutting | CO, gas, oven, car | Hanging, jumping | Gun |
| Availability | Denies/None | Method unavailable | Can acquire easily | Some effort required to prepare | Method ready in the home | Method in hand |
| Time | Denies | No time specified | Specified vaguely, within weeks | Day and time chose, within a week | Plan to complete today | Plan in progress |
| Prior Attempt | Denies | 1 or 2 gestures, low risk attempts | 3 or more gestures, medium risk attempts | History of many threats/attempts | History of highly lethal attempt at least once | Multiple serious attempts |
| Depression | Denies | Feeling low or blue | Mild depression | Chronic depression | Major depression | Major depression and hopelessness |
| Stress Level | Denies | No specific stress or loss | One minor conflict or loss | Several concurrent stressors | Major loss or conflict | Several meaningful losses and changes |
| Health (non-mental) | Denies | Transitory illness (comes and goes) | Acute Illness | Disability or chronic health problems | Severe illness or injury, and/or recent diagnosis | Terminal illness and/or recent diagnosis |
| Isolation (Feelings) | Has good support system | Others present and semi-supportive | Roommate/notable other, semi-involved | Others present but not supportive | Alone, no help nearby | Alone, isolated |
| Mood | A & O x 3 | Coherent | Intoxicated/hallucinating | Distressed/tearful | Depressed/angry | Paranoid/delusional |

Total Risk Assessment Score: ___36___

*A total of 36 points or more requires intervention (Medical Provider or Mental Health Consult or Suicide Watch/FWBC).*

115.    As the Form indicates, a score of 36 points or more required intervention by a Medical Provider, a Mental Health Consult or Suicide Watch/FWBC.

116.    The Intervention/Follow-Up Plan written by Keilwitz stated as follows:

Pt currently withdrawaling (sic) from drugs, Pt denies thoughts of suicide, or self harm, will contact medical provider. Will have pt fill out MHP when feeling better. Pt declined to take the MHP @ this time.

90763143.1

117.    "MHP" is the MEnD mental health process, which in 2017 included providing inmate-patients with a Beck Depression Inventory ("BDI")

118.    The BDI was the only validated assessment tool used by MEnD in 2017.

119.    Yet, the inmate-patients are *asked* if they would like to start the process (which they can decline), and even if they are started on the process they are given the BDI to complete (or not) at their leisure.

120.    Keilwitz signed the MEnD Suicide Risk Screening Form at an unknown time on June 28, 2017.

121.    In addition to the above, a MEnD Chemical Withdrawal Flow Sheet was initiated for Stephanie at 9:57 a.m. on June 28, 2017, by Keilwitz.

122.    Keilwitz noted that she was positive for high pulse, eating disturbances, tremors, sleep issues, agitation and sweating.  He scored her at a 17.

123.    A score of 10 or more required Keilwitz to contact a Medical Doctor for further orders.

124.    Keilwitz's "Follow-Up Plan" from June 28th noted that Stephanie was not eating or sleeping, that she was very anxious and fidgety, that she was nauseated and vomiting, that she was irritable and that there was a notable tremor in her hands.

125.    Further, it noted "provider on call Dr. Todd will start Hydroxyzine."

126.    The June 29 entry on the Chemical Withdrawal Flow Sheet was completed by Keilwitz.  He noted Stephanie continued to suffer from eating disturbances, tremors, sleep issues, agitation and sweating.  In addition, her blood pressure was elevated.

127.    Keilwitz scored Stephanie at a 16.

21

128.    The narrative entry for June 29 by Keilwitz notes that Stephanie was on Zofran and Hydroxyzine.  Yet, Stephanie was vomiting and nauseated, her tremor continued and extended to her hands, and she was sweating and still experiencing sleep issues.

129.    Reportedly, Keilwitz contacted Leonard, who ordered Clonodine.

130.    Keilwitz and Leonard both knew Stephanie was a suicide risk and had a litany of serious medical/mental health conditions.  But neither made an effort on Stephanie's behalf to obtain the care and treatment that she obviously needed.

131.    Keilwitz failed to complete a Suicide Risk Screening Form for Stephanie on June 29.

132.    Next, there was a 3:22 p.m. June 30 Entry on Stephanie's Chemical Withdrawal flow sheet.

133.    The entry was made by "CP, RN" – referring to Defendant Pedersen – and only noted that Stephanie had an elevated pulse and received a score of 2.

134.    Pedersen's "Follow-Up" narrative noted: "Patient stated she is feeling much better eating, sleeping, no tremors, no agitation.  Pt states she has not gotten a shower since incarceration 6/28/17 will speak w/ Sgt Mike."

135.    Pedersen failed to complete a Suicide Risk Screening Form for Stephanie on June 30.

136.    Pedersen knew Stephanie was a suicide risk and had a litany of serious medical/mental health conditions.  But Pedersen made no effort on Stephanie's behalf to obtain the care and treatment that she obviously needed.

90763143.1

137.    Both Keilwitz and nursing supervisor Pederson failed to even follow MEnD's own protocols, including the utilization of their meaningless Suicide Risk Screening Forms.

**C.    The Move to B-Block**

138.    According to after-the-fact, post-hanging reports from Fitzgerald and Dreher, at approximately 4:00 p.m. on June 30, 2017, they were alerted by Pedersen that Stephanie could be moved to a regular cell block on the first floor of the Jail.

139.    Reportedly, in response to Pedersen, Fitzgerald told Dreher to make sure Stephanie had clean clothes and two towels and Dreher gave Bunker three sets of jail issued clothes and brought her to first floor B-Block cell 130.

140.    According to the LETG Administration Actions, Fitzgerald entered a new housing assignment for Stephanie at 4:04:42 p.m. on June 30, 2017.

141.    Fitzgerald logged the move of Stephanie at 4:05:25 p.m. on June 30, 2017.

142.    There is nothing in the documents provided to Plaintiff from Beltrami County showing the 15-minute special watch for Stephanie was ever discontinued.


**THE SUICIDE**

143.    On July 1, 2017, Stephanie remained housed in cell 130 on the first floor of B-Block at the Jail.

144.    Despite there being no documentation that the 15-minute watch with full precautions for Stephanie was discontinued, the PostLog reports show that COs' checks for Stephanie on July 1 were consistently over 15 minutes.

145.    Stephanie was seen for her chemical withdrawal issues on July 1. "KF, RN" – believed to be Kari M. Frenzel – made the last Chemical Withdrawal entry for Stephanie during her incarceration and scored Stephanie at a 6 (trending up from the previous day).

146.    Upon information and belief, later that day, Stephanie was out of her cell for medication pass at 3:40 p.m.

147.    Reportedly, MEnD med passer Reeves delivered medications to Stephanie and Stephanie returned to cell 130.

148.    According to video surveillance from B-Block, at approximately 4:07:22 p.m. Fitzgerald entered the block's common area.

149.    Fitzgerald then peeked into the two cells at the lower left of the still shot from the B-Block surveillance video, as shown below:



150.    Then, Fitzgerald turned to exit B-Block.

151.    Fitzgerald, who knew that Stephanie was a suicide risk, did not go over to Stephanie's cell.

152.    Instead, she reportedly saw Stephanie in the small window on the door to cell 130, as depicted below:



153.    From her location in B-Block, Fitzgerald could not observe what Stephanie was doing in her cell.

154.    Upon information and belief, Fitzgerald completed her "checks" of the B-Block cells in approximately seven seconds.

155.    Upon information and belief, no other Jail correctional or Jail medical staff entered B-Block until Fitzgerald re-entered at approximately 4:28:10 p.m. – nearly 21 minutes later – for meal pass.

156.    Fitzgerald passed one meal at 4:28:33 and then moved on to Stephanie's cell.

157.    Fitzgerald entered Stephanie's cell at approximately 4:28:48 p.m.

158.    Fitzgerald found Stephanie hanging by a bedsheet around her neck that she had affixed to the top of her bunk.

159.    Fitzgerald radioed for medical.

160.    COs Deshane and Bruemmer responded to cell 130 and assisted in cutting Stephanie down and resuscitative efforts.

161.    Reeves also responded to cell 130, as did a Bemidji police officer, and the pair aided with resuscitative efforts.

162.    Stephanie eventually was moved from her cell into the B-Block day room. Around that time, fire department and ambulance personnel arrived and took over the scene.

163.    A pulse was eventually detected and Stephanie was placed onto a gurney and transported to the Sanford Bemidji Medical Center Emergency Room.

164.    Stephanie required transfer to Sanford Hospital in Fargo via helicopter.

165.    Bruemmer accompanied Stephanie and medical personnel in the helicopter for her transport.

166.    While at Sanford – Fargo, a brain function test was completed and showed Stephanie had no brain function.  This information was conveyed to the family at approximately 1:00 p.m. on July 11, 2017.

167.    The hospital staff agreed to permit additional family members to pay their respects prior to withdrawing care for Stephanie.

90763143.1

168.    Additional members of the family arrived around 4:45 p.m. on July 11, 2017, and at approximately 5:45 p.m. the family decided to have Stephanie's medical cares withdrawn.

169.    Stephanie died at 6:01 p.m. on July 11, 2017.

## KEILWITZ ATTEMPTS A POST-DEATH COVER UP BY CHANGING THE SUICIDE RISK SCREENING FORM

170.    Keilwitz completed a *second* MEnD Suicide Risk Screening Form for Stephanie on July 12, 2017 – that is, *after* her death.

171.    On this July 12 Suicide Risk Screening Form, Keilwitz changed the answers previously recorded for Stephanie to lower her Total Risk Assessment Score from 36 to 28 – a score below the threshold requiring additional intervention.

172.    The post-death Suicide Risk Screening Form is included below and shows that Keilzwitz altered Stephanie's prior attempt to "denies."

## MEND
CORRECTIONAL CARE

# Suicide Risk Screening Form

Inmate Name: Bunker, Stephanie    DOB: 4-24-78    ID: N/A

Indication for Screening:

☑ Abnormal Health Assessment Screen    ☐ BDI Score >40    ☐ Altered Mental Status

☐ Current Suicidal Remarks/Actions    ☐ Currently on Suicide Watch/Observation    ☐ MHW

☐ Other

**Inmate appears to engage sufficiently to consider this a valid assessment?** ☑ Yes ☐ No

| | Low Risk 0 | 2 | 4 | 6 | 8 | High Risk 10 |
|---|---|---|---|---|---|---|
| Plan | Denies/None | Vague, uncertain plan | Clear thoughts, reflective | Some specific | Written note and/or well thought out plan | Note written, time, place, and method chosen |
| Method | Denies None | Undecided | Pills, cutting | CO, gas, oven, etc. | Hanging, jumping | Gun |
| Availability | Denies/None | Method unavailable | Can acquire easily | Some effort required to prepare | Method ready in home | Method in hand |
| Time | Denies | No time specified | Specified vaguely, within weeks | Day and time chose, within a week | Plan complete today | Plan in progress |
| Prior Attempt | Denies | 1 or 2 gestures, low risk attempts | 3 or more gestures, medium risk attempts | History of many threats/attempts | History of highly lethal attempt at least once | Multiple serious attempts |
| Depression | Denies | Feeling low or blue | Mild depression | Chronic depression | Major depression | Major depression and hopelessness |
| Stress Level | Denies | No specific stress or loss | One minor conflict or loss | Several concurrent stressors | Major loss or conflict | Several meaningful losses and changes |
| Health (non-mental) | Denies | Transitory illness (comes and goes) | Acute Illness | Disability or chronic health problems | Severe illness or injury, and/or recent diagnosis | Terminal illness and/or recent diagnosis |
| Isolation (Feelings) | Has good support system | Others present and semi-supportive | Roommate/notable other, semi-involved | Others present but not supportive | Alone, no help nearby | Alone, isolated |
| Mood | A & O x 3 | Coherent | Intoxicated/hallucinating | Distressed/tearful | Depressed/angry | Paranoid/delusional |

Total Risk Assessment Score: 28

A total of 36 points or more requires intervention (Medical Provider or Mental Health Consult or Suicide Watch/FWBC).

173.    Keilwitz also added a "late entry" to his Intervention/Follow-Up Plan – which does not include a date or time – on Stephanie's initial Suicide Risk Screening Form in an attempt to justify his post-death changes.  In that late entry, Keilwitz wrote: "Pt stated @ the time of assessment 'Just because I have had past suicidal thoughts doesn't make me suicidal.'"

90763143.1

174.    Keilwitz's post-death changes, and his purported explanation for them, were contradicted by Stephanie's own Initial Health Assessment (which Keilwitz himself completed) and her answers to the booking medical questions.

175.    Keilwitz fabricated these changes in a misguided attempt to protect himself from liability.

## ADDITIONAL AFTER-THE-FACT
## ACTIONS BY MEnD

176.    The pharmacy orders for Stephanie were not signed by Leonard until on or after July 5, 2017.

177.    Four out of the five Medical Staff Narrative Notes for Stephanie during her period of incarceration at the Jail that is the subject of this lawsuit were created after she hanged herself.

178.    First, a 7:24 a.m. July 2, 2017 note from Frenzel noted she only learned about Stephanie's hanging from reading Reeves's note.

179.    Second, an 8:30 a.m. July 2, 2017 note from Frenzel noted she called Jim, the on-call administrator, to alert him of the situation with Stephanie.

180.    Next, Keilwitz's completed a Medical Staff Narrative Note at 3:25 p.m. on July 12, 2017.

181.    In this post-hanging and post-death note, Keilwitz reported that during his assessment *two weeks earlier*, Stephanie had "claimed she was not suicidal" but was concerned with her withdrawal:

90763143.1



# Medical Staff Narrative Note

Inmate Name: Bunker, Stephanie        DOB: 4-24-78   ID#: N/A

| Date/Time | Content/Note |
|---|---|
| 7/12/17 1525 | Late entry. Met C pt on 6/28/17, Pt during the assessment claimed she was not suicidal that she had made comments to the Jail Staff that "She had had previous thoughts of suicide but that dosent mean that I'm suicidal" Pt was concerned of her withdrawal at that time. Writer called provider after assessment and discussed the pt and that she had scored a 36 on her Suicide risk screen form as well as withdrawal and that the pt had denied suicidal thoughts or tendencies. Due to chem withdrawal score we would start the pt on medication. At this point the patient was on medical segregation and the Jail Staff had the pt on a 15 min watch with full precautions, which was documented on the medical pass on to the Jail Staff. Pt also had a score of 36 on her suicide risk screen form but the score for prior history of suicide from Over Dose was from prior history of drug abuse. Pt did not purposefully attempt to over dose per pt during her assessment During the dates of 6/28/17 through 6/29/17 for pt's chem withdrawal flow sheet pt at no time made comments of depression, or suicidal thoughts or tendency's. Pt was direct with comments and made good eye contact but was also showing signs and symptoms associated with withdrawal.  _____ RN 7-12-17 ——— |

90763143.1

182.     Keilwitz also claimed that he had called Leonard to discuss Stephanie's Initial Health Assessment, the Suicide Risk Screening score of 36, and the Chemical Withdrawal Flow Sheet.

183.     Keilwitz noted that at that time, Stephanie was on "medical segregation" and "the Jail Staff had the pt on a 15 min watch with full precautions, which was documented on the medical pass on to the Jail Staff."

184.     Keilwitz also tried to explain away the damning score he assigned Stephanie on the prior history section of the June 28, 2017 Suicide Risk Screening Form – claiming that she did not purposefully attempt an overdose – completely contradicting the information obtained from Stephanie during her booking, which Keilwitz reviewed prior to his assessment of Stephanie.

185.     Keilwitz also claimed, after she died, that Stephanie "at no time made comments of depression, or suicidal thoughts or tendency's (sic)" – again, completely contradicting the information Keilwitz himself wrote on Stephanie's Initial Health Assessment and on her Suicide Risk Screening Form

### THE MINNESOTA DEPARTMENT OF CORRECTIONS FINDS VIOLATIONS WITH REGARD TO STEPHANIE'S INCARCERATION AT THE JAIL

186.     The Minnesota Department of Corrections ("DOC") determined that the Jail had violated the Administrative Rules governing correctional facilities (Minnesota Rules, Part 2911) in several ways with regard to Stephanie's incarceration.

187.     The DOC concluded:

- Stephanie refused three different times to change into an anti-suicide smock. This should not have been allowed by jail staff as it is contrary to facility policy and procedure and Stephanie was on full suicide precautions.

- Multiple 15-minute special watch checks were late. This was a violation of facility policy and procedure as well as Part 2911.

- Stephanie's classification form was not completed appropriately. Notations of suicide risk, intoxication and withdrawal issues were not noted.

188.    Beltrami County Sheriff Hodapp, who had ultimate responsibility for the Jail, agreed that inmates do not have a choice with regard to changing into a suicide smock.

189.    Further, the DOC noted concerns with the lack of communication between medical staff and custody staff. This is a common issue for MEnD and happens by design, as squelching the exchange of information between medical and correctional staff makes it easier for each to disclaim knowledge of, or responsibility for, inmate mental-health problems.

## DEFENDANTS' KNOWLEDGE & STEPHANIE'S SUFFERING

190.    Throughout Stephanie's confinement at the Jail, she displayed and reported obvious signs of experiencing a serious mental-health crisis.

191.    Stephanie admitted to suicidal ideations, recent treatment for psychological issues, recent suicidal attempts, prior treatment for "depression anxiety disorder…everything," that her mind was being controlled by someone else, that people

32

could read her mind, that she had felt useless or sinful every day, that she was off her medication(s) for mental/emotional health problems, and that she had been in the hospital "many times" for emotional or mental-health problems – all of which were combined with severe and recent substance abuse and withdrawal issues.

192.    This information was entered in to Stephanie's file on the LETG.

193.    This information also was entered into Stephanie's medical file at the Jail.

194.    This information or the decisions and conclusions therefrom were communicated to COs and medical personnel, alike, including Defendants.

195.    Stephanie also admitted to a history of highly lethal suicide attempt at least once, major depression and hopelessness and several meaningful losses and changes, leading her to score a 36 on the MEnD Suicide Risk Screening Form.

196.    Defendants deliberately ignored the information and warnings Stephanie provided to them upon her arrival and throughout her stay at the Jail, including her substance-abuse issues, severe withdrawal symptoms, suicidal ideations, and extreme mental-health issues.

197.    The issues Stephanie relayed and exhibited during her time at the Jail mandated further evaluation of her mental-health, immediately.

198.    Instead, Stephanie was moved to B-Block, given multiple sets of towels, regular clothing and the means and opportunity to hang herself.

199.    Stephanie was not seen, assessed, treated or monitored by a Qualified Mental Health Professional while at the Jail.  Instead, Defendants permitted unqualified individuals, including correctional officers and the unqualified MEnD Defendants, to "assess" and

ignore inmates' serious mental health needs, leading to the violation of Stephanie's constitutional rights.

200.     Further, Stephanie's "prescribing physician" – Defendant Leonard – never even saw her during her time at the Jail.

201.     Defendants also failed to ensure that Stephanie, who was suffering from a mental-health crisis, did not have the means and opportunity to commit suicide during her incarceration at the Jail on July 1.

202.     Additionally, from the review of the video footage, it is clear Fitzgerald acted with deliberate indifference to Stephanie's constitutional rights by failing to timely complete checks and determine the "well-being" that forms the essence and purpose of such checks – particularly for those on a heightened watch status that required heightened scrutiny.

203.     Stephanie incurred special damages prior to her death, including but not limited to ambulance and EMS charges, life-flight charges, medical bills from the Bemidji and Fargo Hospitals and physicians associated therewith.

204.     Stephanie suffered a loss of economic opportunity.

205.     Stephanie suffered extreme physical and mental pain and suffering from June 26 to July 11.

206.     Stephanie suffered a loss of future enjoyment of her life.

207.     Plaintiff is entitled to recover these damages for Stephanie.

90763143.1

## COUNT ONE

### 42 U.S.C. § 1983
### EIGHTH AND FOURTEENTH AMENDMENT VIOLATIONS
*Plaintiff v. Defendants Fitzgerald, Davis and Dreher*

208.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

209.    Severe mental illness, suicidal ideations and drug withdrawal are serious medical needs.

210.    Defendants Fitzgerald, Davis and Dreher had a constitutional duty to provide for the safety and general well-being, and to treat the medical and mental-health needs, of Stephanie, including protecting her from herself, as an inmate at the Jail.

211.    Defendants Fitzgerald, Davis and Dreher, under the color of state law, acted with deliberate indifference to Stephanie's life-threatening medical needs and her serious risk of suicide during confinement at the Jail, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

212.     Defendants Fitzgerald, Davis and Dreher, under the color of state law, knew of and disregarded an obvious and serious risk to Stephanie's health and safety and acted with deliberate indifference in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

213.    Defendants Fitzgerald, Davis and Dreher subjected Stephanie to these deprivations of rights either maliciously or by acting with reckless disregard for whether Stephanie's rights would be violated by their actions.

90763143.1

214.     Stephanie suffered and died as a direct and proximate result of the acts and omissions of Defendants Fitzgerald, Davis and Dreher and Stephanie was thereby damaged in an amount yet to be determined.

215.     Punitive damages are available against Defendants Fitzgerald, Davis and Dreher and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

216.     Plaintiff is entitled to recovery of her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT TWO

**42 U.S.C. § 1983**
**EIGHTH AND FOURTEENTH AMENDMENT VIOLATIONS**
*Plaintiff v. Defendants Pedersen and Keilwitz*

217.      Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

218.     Severe mental illness, suicidal ideations and drug withdrawal are serious medical needs.

219.     Defendants Pedersen and Keilwitz had a constitutional duty to provide for the safety and general well-being, and to treat the medical and mental-health needs, of Stephanie, including protecting her from herself, as an inmate at the Jail.

220.     Defendants Pedersen and Keilwitz, under the color of state law, acted with deliberate indifference to Stephanie's life-threatening medical needs and serious risk of

36

suicide during her confinement at the Jail, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

221.    Defendants Pedersen and Keilwitz, under the color of state law, knew of and disregarded an obvious and serious risk to Stephanie's health and safety and acted with deliberate indifference in violation of the Eight and Fourteenth Amendments to the United States Constitution.

222.    Defendants Pedersen and Keilwitz subjected Stephanie to these deprivations of her rights either maliciously or by acting with reckless disregard for whether Stephanie's rights would be violated by their actions.

223.    Stephanie suffered and died as a direct and proximate result of the acts and omissions of Defendants Pedersen and Keilwitz and Stephanie was thereby damaged in an amount yet to be determined.

224.    Defendants Pedersen and Keilwitz, as nurses employed by the private medical provider, MEnD, are not entitled to qualified immunity under *Richardson v. McKnight*, 521 U.S. 399 (1997), *Harrison v. Ash*, 539 F.3d 510 (6th Cir. 2008) and *Parreant v. Schotzko*, No. 00-2014 (JRT/JGL), 2001 WL 1640137, at *5 (D. Minn. Sept. 30, 2001).

225.    Plaintiff is entitled to recovery of her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

90763143.1

## COUNT THREE

### 42 U.S.C. § 1983
### EIGHTH AND FOURTEENTH AMENDMENT VIOLATIONS
#### *Plaintiff v. Defendant Todd Leonard, MD*

226.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

227.    Severe mental illness, suicidal ideations, and drug withdrawal are serious medical needs.

228.    Defendant Leonard, as the Jail Medical Director, the Jail Physician, policy maker and sole member of MEnD Correctional Care had a constitutional duty to provide for the safety and general well-being, and to treat the medical and mental-health needs, of Stephanie, including protecting her from herself, as an inmate at the Jail.

229.    Defendant Leonard, under the color of state law, acted with deliberate indifference to Stephanie's life-threatening medical needs and serious risk of suicide during her confinement at the Jail, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

230.    Defendant Leonard, under the color of state law, knew of and disregarded an obvious and serious risk to Stephanie's health and safety and acted with deliberate indifference in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

231.    Defendant Leonard subjected Stephanie to these deprivations of her rights either maliciously or by acting with reckless disregard for whether Stephanie's rights would be violated by Defendant Leonard's actions.

90763143.1

232.    Stephanie suffered and died as a direct and proximate result of Defendant Leonard's acts and omissions, and Stephanie was thereby damaged in an amount yet to be determined.

233.    Defendant Leonard, as the Jail Medical Director and Jail Physician employed by the private medical provider, MEnD, is not entitled to qualified immunity under *Richardson v. McKnight*, 521 U.S. 399 (1997), *Harrison v. Ash*, 539 F.3d 510 (6th Cir. 2008), and *Parreant v. Schotzko*, No. 00-2014 (JRT/JGL), 2001 WL 1640137, at *5 (D. Minn. Sept. 30, 2001).

234.    Punitive damages are available against Defendant Leonard and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

235.    Plaintiff is entitled to recovery of her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT FOUR

### CIVIL RIGHTS VIOLATIONS – SUPERVISORY LIABILITY
#### *Plaintiff v. Defendant Todd Leonard, MD*

236.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

237.    Severe mental illness, suicidal ideations, and drug withdrawal are serious medical needs.

90763143.1

238.    Defendant Leonard had a constitutional duty to provide for the safety and general well-being, and to treat the medical and mental-health needs, of Stephanie, including protecting her from herself, as an inmate at the Jail.

239.    Defendant Leonard was a supervisory employee as the owner of MEnD and the Jail Medical Director and Jail Physician at the Beltrami County Jail, and he, with callous or reckless indifference to the rights of inmates, failed to properly supervise, instruct, and train correctional and medical staff in the recognition of inmates with serious mental-health needs, inmates who are suicidal, and in the prevention of suicide in correctional facilities.

240.    Defendant Leonard, under the color of state law, acted with deliberate indifference to Stephanie's life-threatening medical needs and serious risk of suicide during her confinement at the Jail, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

241.    Defendant Leonard subjected Stephanie to these deprivations of her rights either maliciously or by acting with reckless disregard for whether Stephanie's rights would be violated by Defendant Leonard's actions.

242.    Stephanie suffered and died as a direct and proximate result of Defendant Leonard's acts and omissions, and Stephanie was thereby damaged in an amount yet to be determined.

243.    Punitive damages are available against Defendant Leonard and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

90763143.1

244.    Plaintiff is entitled to recovery of her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT FIVE

### CIVIL RIGHTS VIOLATIONS UNDER
*MONELL V. DEP'T OF SOCIAL SERVICES*
*Plaintiff v. Defendant MEnD Correctional Care*

245.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

246.    Before July 1, 2017, MEnD Correctional Care, PLLC, with deliberate indifference to the rights of inmates at the Beltrami County Jail, and the other jails that it contracts with including but not limited to, Sherburne, Stearns and Todd County, initiated, tolerated, permitted, failed to correct, promoted, and ratified a custom, pattern or practice on the part of its medical staff, including Defendants Pedersen, Keilwitz and Leonard, of failing to provide for the safety and general well-being of inmates and failing to protect inmates from themselves and/or risks of suicide.

247.    MEnD staffed Beltrami County Jail and the other jails that it contracts with, including but not limited to, Sherburne, Stearns and Todd County, with individuals unqualified to assess inmates' serious medical needs and/or incentivized them to ignore those serious medical needs, including Stephanie's.

248.    There is a direct and causal link between MEnD's maintenance of a systemic, dangerous and unconstitutionally deficient medical-care system and Stephanie's suicide.

249.    Stephanie's suffering and wrongful death and the violation of her civil rights were directly and proximately caused by the aforementioned acts and omissions by MEnD's

41

policies, customs, patterns or practices, and MEnD is thereby liable in an amount as yet to be determined.

250.    Punitive damages are available against MEnD and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 20 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.  *See Woodward v. Correctional Medical Services*, 368 F.3d 917 (7th Cir. 2004); *Revilla v. Glanz*, 8 F. Supp. 3d 1336 (N.D. Okla. 2014).

251.    Plaintiff is entitled to recovery of her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT SIX

### CIVIL RIGHTS VIOLATIONS UNDER
### *MONELL V. DEP'T OF SOCIAL SERVICES*
### *Plaintiff v. Defendants Phil Hodapp and Beltrami County*

252.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as if fully set forth herein.

253.    Before July 1, 2017, Defendants Phil Hodapp and Beltrami County, with deliberate indifference to the rights of inmates at the Beltrami County Jail, initiated, tolerated, permitted, failed to correct, promoted, and ratified a custom, pattern or practice on the part of its correctional officers, including Defendants Fitzgerald, Davis and Dreher, of failing to provide for the safety and general well-being of inmates and failing to protect inmates from themselves and/or risks of suicide.

254.    None of the correctional staff were disciplined with regard to their conduct relating to Stephanie.

255.    Before July 1, 2017, Defendants Hodapp and Beltrami County, with deliberate indifference to the rights of inmates at the Beltrami County Jail, initiated, tolerated, permitted, failed to correct, promoted, and ratified a custom, pattern or practice on the part of its correctional officers, of failing to provide an adequate number of suicide resistant smocks or to require suicidal inmates to be placed in suicide smocks and switch out their bedding for tear resistant sheets, instead allowing the inmate to refuse such suicide precautions.

256.    Further, by contracting with Defendants MEnD and Leonard, who were unfit and/or unwilling to provide Beltrami County inmates with constitutionally mandated mental-health care, Beltrami County itself was deliberately indifferent to the serious medical needs of its inmates.

257.    Stephanie's wrongful death and the violation of her civil rights were directly and proximately caused by the aforementioned acts and omissions and the customs, patterns or practices of Defendants Hodapp and Beltrami County (directly or through its agent, MEnD) and Beltrami County is thereby liable in an amount as yet to be determined.

258.    Plaintiff is entitled to recovery of her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Carol Bunker, as Trustee for the next-of-kin of Stephanie Bunker, prays for judgment against Defendants as follows:

90763143.1

1.      That this Court find that the Defendants committed acts and omissions constituting violations of the Eighth and Fourteenth Amendments to the United States Constitution, actionable under 42 U.S.C. § 1983;

2.      As to Count I, a money judgment against Defendants Fitzgerald, Davis and Dreher for compensatory and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

3.      As to Count II, a money judgment against Defendants Pedersen and Keilwitz for compensatory and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

4.      As to Count III, a money judgment against Defendant Leonard for compensatory and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

5.      As to Count IV, a money judgment against Defendant Leonard for compensatory and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

6.      As to Count V, a money judgment against Defendant MEnD Correctional Care, PLLC, for compensatory and punitive damages in an amount to be determined by the

jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

7.      As to Count VI, a money judgment against Beltrami County for compensatory damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

8.      For an order mandating changes in the policies and procedures of the Beltrami County Jail requiring, among other things, policy/training measures in the recognition of serious mental illness and suicidal ideation and in the prevention of suicide among inmates; and

9.      For such other and further relief as this Court may deem just and equitable.

Dated:  June 25, 2020                    **ROBINS KAPLAN LLP**

                                        s/Andrew J. Noel
                                        Robert Bennett, #6713
                                        Andrew J. Noel, #322118
                                        Kathryn H. Bennett, #0392087
                                        Marc E. Betinsky, #0388414
                                        800 LaSalle Ave, Suite 2800
                                        Minneapolis, MN 55402
                                        Telephone:  612-349-8500
                                        rbennett@robinskaplan.com
                                        anoel@robinskaplan.com
                                        kbennett@robinskaplan.com
                                        mbetinsky@robinskaplan.com

                                        *Attorneys for Plaintiff Carol Bunker*