UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Carol Bunker, as Trustee for the
next-of-kin of Stephanie Rose Bunker,

        Plaintiff,

v.

Barb Fitzgerald, acting in her individual capacity as a Beltrami County correctional officer; Jared Davis, acting in his individual capacity as a Beltrami County correctional officer; Katherine Dreher, acting in her individual capacity as a Beltrami County correctional officer; Crystal Pedersen, acting in her individual capacity as medical staff in the Beltrami County Jail; Geoffrey Keilwitz, acting in his individual capacity as medical staff in the Beltrami County Jail; Todd Leonard, MD, acting in his individual and official capacity as the Medical Director and Jail Physician at the Beltrami County Jail and sole owner of MEnD Correctional Care, PLLC; MEnD Correctional Care, PLLC; Phil Hodapp, in his official capacity as Beltrami County Sheriff; and Beltrami County,

        Defendants.

Case No. 20-cv-01456 (SRN/LIB)

**PLAINTIFF'S STATEMENT OF THE CASE**

---

1. **The Facts of the Case**

      Stephanie Bunker suffered from mental illness, including anxiety and depression as well as substance abuse. Late on June 25, 2017, she was arrested for driving under the influence, driving after revocation and shoplifting. She was booked at the Beltrami County Jail in the early morning hours of June 26 and due to her criminal history and the Order regarding her first court date, it was clear she would not be released from jail anytime soon.

90973121.1

Stephanie was "extremely high" upon intake, yet her booking medical questionnaire was not completed until June 27. Her answers to the Booking Medical Questions revealed she was suffering from depression, behavioral abnormalities, addiction issues, withdrawal and psychosis. Further, she revealed she was suicidal. She was unpredictable and a danger to herself. She was obviously a high suicide risk from her answers to the Booking Medical Questions and required protection from herself, hospitalization or both. Defendant Davis told another Correctional Officer (CO) that Stephanie was "suicidal." The other CO, Katherine Dreher, alerted a Sgt and MEnD personnel of Stephanie's suicidality. Due to the information obtained from Stephanie, she was placed on full precautions and a 15-minute watch (a heightened watch status for inmates that pose a risk to themselves). This information was conveyed to the COs via the Jail Inmate History for Stephanie, as well as her Jail Housing Log and the Jail Briefing Sheet/Pass On. The heightened watch was conveyed to the MEnD personnel at the Jail via the MEnD Pass On – Medical Staff Form, which noted: "Bunker 15 min watch full precautions." There was also a written note from a CO noting that Stephanie needed to be changed into a smock. No one put Stephanie into a smock. Not Davis. Not Dreher. Not the Sgt. Not any MEnD medical personnel. None of the named Defendants. No one. Instead, it was claimed that, first, there were not enough clean smocks. Then, Stephanie was permitted to **refuse** the smocks three times during her incarceration. Further, despite, Stephanie being on special watch for suicide risk, there were numerous checks that occurred over the 15-minute mark.

2

MEnD Correctional Care, PLLP, has contracted with Beltrami County, and others to provide medical care to the inmates at their jails. The systemic issues regarding the MEnD-developed forms (that provide the illusion of care, evaluation and monitoring of the inmates and detainees), as well as having lower-paid RNs as the boots on the ground (to "evaluate, monitor and treat" the inmates and detainees) was flushed out in Plaintiff's Complaint. Recently, additional, severe allegations regarding deliberate indifference by MEnD, Defendant Leonard and Beltrami County COs came to light. See, attached July 11 Star Tribune article by Chao Xiong. The Corrections Commissioner has called for a criminal investigation into s 2018 Beltrami County inmate death. The FBI is currently investigating the allegations. Similar issues highlighted in the 2018 death of Hardel Sherrell are present in Stephanie's suicide at the Jail.

Defendant Keilwitz, a RN for MEnD Correctional Care, saw Stephanie on June 28 for her Initial Health Assessment. Keilwitz reviewed Stephanie's answers to the Booking Medical Questions, which were included in her jail medical file and revealed her numerous serious medical needs, including that she was a suicide risk. However, Keilwitz reported that Stephanie claimed she was not suicidal on the 28th. Keilwitz then filled out a MEnD Suicide Risk Screen From due to her "Abnormal Health Assessment Screen." He scored Stephanie at a 36, requiring medical provider or mental health consult or suicide watch/FWBC. Keilwitz did not start Stephanie on MEnD's mental health process, which included the validated Beck Depression Inventory. Keilwitz also filled out a MEnD Chemical Withdrawal Flow sheet, which

noted significant withdrawal symptoms and required notice to someone with more qualifications.  Defendant Leonard was informed of the information obtained by Keilwitz and started Stehpanie on Hydroxyzine (the typical band aid used by MEnD for mental health and/or withdrawal issues.)

Keilwitz saw Stephanie again on June 29.  He did not fill out a Suicide Risk Screen Form, despite her high score the previous day and her having been placed on full suicide precautions.  Stehpanie's significant withdrawal and mental health issues continued. Keilwitz and Leonard both knew Stephanie was a suicide risk and had a litany of serious medical/mental health conditions.  But neither made an effort on Stephanie's behalf to obtain the care and treatment that she obviously needed.

The next action by MEnD was through Defendant Pederson, another RN and the Nursing Supervisor at Beltrami County Jail, who filled out the Chemical Withdrawal Flow Sheet for Stephanie on June 30 – where she scored Stephanie at only a 2.  Pederson failed to complete a Suicide Risk Screening Form for Stephanie on June 30. Pederson knew Stephanie was a suicide risk and had a litany of serious medical/mental health conditions.  But Pederson made no effort on Stephanie's behalf to obtain the care and treatment that she obviously needed.  Both Keilwitz and nursing supervisor Pederson failed to even follow MEnD's own protocols, including the utilization of their meaningless Suicide Risk Screening Forms.

According to after-the-fact, post-hanging reports from Fitzgerald and Dreher, at approximately 4:00 p.m. on June 30, 2017, they were alerted by Pederson that Stephanie could be moved to a regular cell block on the first floor of the Jail.

Reportedly, in response to Pederson, Fitzgerald told Dreher to make sure Stephanie had clean clothes and two towels and Dreher gave Bunker three sets of jail issued clothes and brought her to first floor B-Block cell 130. According to the LETG Administration Actions, Fitzgerald entered a new housing assignment for Stephanie at 4:04:42 p.m. on June 30, 2017. Fitzgerald logged the move of Stephanie at 4:05:25 p.m. on June 30, 2017. There is nothing in the documents provided to Plaintiff from Beltrami County showing the 15-minute special watch for Stephanie was ever discontinued.

      On July 1, 2017, Stephanie remained housed in cell 130 on the first floor of B-Block at the Jail. Despite there being no documentation that the 15-minute watch with full precautions for Stephanie was discontinued, the PostLog reports show that COs' checks for Stephanie on July 1 were consistently over 15 minutes. Stephanie was seen for her chemical withdrawal issues on July 1. "KF, RN" – believed to be Kari M. Frenzel – made the last Chemical Withdrawal entry for Stephanie during her incarceration and scored Stephanie at a 6 (trending up from the previous day). Upon information and belief, later that day, Stephanie was out of her cell for medication pass at 3:40 p.m. Reportedly, MEnD med passer Reeves delivered medications to Stephanie and Stephanie returned to cell 130. According to video surveillance from B-Block, at approximately 4:07:22 p.m. Fitzgerald entered the block's common area. Fitzgerald, who knew that Stephanie was a suicide risk, did not go over to Stephanie's cell. Instead, she reportedly saw Stephanie in the small window on the door to cell 130, after peeking into two other cells in B-Block. From her location in B-Block,

5

Fitzgerald could not observe what Stephanie was doing in her cell. Upon information and belief, Fitzgerald completed her "checks" of the B-Block cells in approximately seven seconds. Upon information and belief, no other Jail correctional or Jail medical staff entered B-Block until Fitzgerald re-entered at approximately 4:28:10 p.m. – nearly 21 minutes later – for meal pass. She passed one meal at 4:28:33 and then moved on to Stephanie's cell, which she entered at approximately 4:28:48 p.m. Fitzgerald found Stephanie hanging by a bedsheet around her neck that she had affixed to the top of her bunk.

Stephanie was transported to Sanford Bemidji Medical Center and then airlifted to Sanford Hospital – Fargo, where she died on July 11, 2017, after medical care was withdrawn.

Then, Keilwitz set in motion his post-death cover up. He completed a *second* MEnD Suicide Risk Screening Form for Stephanie on July 12, 2017 – that is, *after* her death. On this July 12 Suicide Risk Screening Form, Keilwitz changed the answers previously recorded for Stephanie to lower her Total Risk Assessment Score from 36 to 28 – a score below the threshold requiring additional intervention. On the post-death Suicide Risk Screening Form Keilzwitz altered Stephanie's prior attempt to "denies." The post-death changes, and the purported explanation for them, were contradicted by Stephanie's own Initial Health Assessment (which Keilwitz himself completed) and her answers to the booking medical questions. Keilwitz fabricated these changes in a misguided attempt to protect himself from liability.

6

There were additional after-the-death actions by MEnD. The pharmacy orders for Stephanie were not signed by Leonard until on or after July 5, 2017. Four out of the five Medical Staff Narrative Notes for Stephanie during her period of incarceration at the Jail that is the subject of this lawsuit were created after she hanged herself. First, a 7:24 a.m. July 2, 2017 note from Frenzel noted she only learned about Stephanie's hanging from reading Reeves's note. Second, an 8:30 a.m. July 2, 2017 note from Frenzel noted she called Jim, the on-call administrator, to alert him of the situation with Stephanie. Next, Keilwitz's completed a Medical Staff Narrative Note at 3:25 p.m. on July 12, 2017. In this post-hanging and post-death note, he reported that during his assessment *two weeks earlier*, Stephanie had "claimed she was not suicidal" but was concerned with her withdrawal. Keilwitz also claimed that he had called Leonard to discuss Stephanie's Initial Health Assessment, the Suicide Risk Screening score of 36, and the Chemical Withdrawal Flow Sheet. Further, he noted that at that time, Stephanie was on "medical segregation" and "the Jail Staff had the pt on a 15 min watch with full precautions, which was documented on the medical pass on to the Jail Staff." Keilwitz also tried to explain away the damning score he assigned Stephanie on the prior history section of the June 28, 2017 Suicide Risk Screening Form – claiming that she did not purposefully attempt an overdose – completely contradicting the information obtained from Stephanie during her booking, which Keilwitz reviewed prior to his assessment of Stephanie. He also claimed, after she died, that Stephanie "at no time made comments of depression, or suicidal thoughts or tendency's (sic)" – again, completely contradicting

7

the information Keilwitz himself wrote on Stephanie's Initial Health Assessment and on her Suicide Risk Screening Form.

2. **Liability**

   This action arises purely out of 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the Constitution. State-law claims and, by consequence, the limitations and defenses under state law are not applicable to this civil-rights lawsuit.

3. **Damages**

   Stephanie Bunker died as a proximate result of the deliberate indifference of the Defendants from June 26, 2017 to July 1, 2017, described above and in detail in the Complaint, while she was incarcerated at the Beltrami County Jail. Money damages sought are sought and they are attributable to the deprivation of Stephanie's civil rights under federal common law and *not* the state wrongful-death measure of damages.

4. **Plaintiff's Medical Providers**

   Defendants are aware of the medical facilities involved in the post-hanging care of Stephanie Bunker from the arrival of EMS to the Beltrami County Jail through the end of her life on July 11, 2017s. Plaintiff will provide signed authorizations for Stephanie's medical records upon receipt from Defendants and will continue to update disclosures in accordance with the Federal Rules of Civil Procedure and Orders of this Court with regard to any additional medical records deemed discoverable in this action.

Dated:  October 8, 2020                    **ROBINS KAPLAN LLP**

                                                     s/Kathryn H. Bennett
                                                     Robert Bennett, #6713
                                                     Andrew J. Noel, #322118
                                                     Kathryn H. Bennett, #0392087
                                                     Marc E. Betinsky, #0388414
                                                     800 LaSalle Ave, Suite 2800
                                                     Minneapolis, MN 55402
                                                     Telephone:  612-349-8500
                                                     rbennett@robinskaplan.com
                                                     anoel@robinskaplan.com
                                                     kbennett@robinskaplan.com
                                                     mbetinsky@robinskaplan.com

                                                     *Attorneys for Plaintiff Carol Bunker*